# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-10675

United States Court of Appeals
Fifth Circuit

**FILED**

July 6, 2017

Lyle W. Cayce
Clerk

EZMERELDA RIVERA,

Plaintiff–Appellant,

v.

A. J. BONNER; DAVID B. MULL,

Defendants–Appellees.

Appeal from the United States District Court
for the Northern District of Texas

Before PRADO, HIGGINSON, and COSTA, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

In December 2014, Appellant Ezmerelda Rivera was sexually assaulted by Manuel Fierros, an officer at the Hale County Jail. Rivera subsequently brought claims under 42 U.S.C. § 1983 against Fierros, Hale County Sheriff David Mull, and Hale County Jail Administrator A.J. Bonner. Rivera claimed that Mull and Bonner (collectively, "Appellees") were deliberately indifferent in hiring Fierros and that they inadequately trained and supervised jail employees. The district court granted summary judgment and dismissed Rivera's claims against Appellees. We AFFIRM.

No. 16-10675

## I. BACKGROUND

Fierros was hired as a jailer at the Hale County Jail in October 2012. During the hiring process, Appellees became aware that Fierros had been arrested on two occasions when he was fifteen years old—once in Randall County and once in Potter County—for indecency with a child by sexual contact. After learning about these arrests, Bonner purportedly called the Randall County district attorney's and probation offices as well as the Potter County district attorney's office to inquire about the incidents. Bonner claims that no records of the arrests were found, the individuals he spoke with had no knowledge of the charges, and "no convictions [were] shown."

In July 2014, a senior jailer at the Hale County Jail sexually abused a female detainee. The jailer stood outside the detainee's cell and directed her to perform sexual acts on herself. This incident was caught on the jail's video surveillance system and was reported to jail authorities by another officer who observed the abuse. After an investigation, the jailer admitted to the abuse and resigned. In subsequent staff briefings, jail officials purportedly reminded jail staff that sexual exploitation of detainees was prohibited, but they did not implement any additional training regarding sexual misconduct. Jail officials also displayed a poster at the facility that showed a red prohibition sign across the words "sex with inmates," followed by "it's a felony." No policies or procedures were revised in response to the incident.

Approximately six months later, in the early morning hours of December 14, 2014, Rivera was arrested for public intoxication in connection with her husband's arrest for driving while intoxicated. Both Rivera and her husband were transported to the Hale County Jail, where Fierros was the officer in charge that night. After Rivera arrived at the jail, a female officer took her into a private room and instructed her to change into orange scrubs with no undergarments underneath. Fierros then took over the booking process.

2

No. 16-10675

Fierros escorted Rivera into the jail's "multipurpose room," which was used by the jail for bookings and arraignments, as well as for inmates to meet with attorneys and chaplains. The room was not monitored by video surveillance. Fierros instructed two female jailers to exit the room, leaving him alone with Rivera. Fierros then groped Rivera's breasts and forced her to perform oral sex on him. Fierros was left alone with Rivera for approximately fifty-five minutes, during which time he left and reentered the room at various times. Rivera was released from the jail the following day. After Rivera filed a complaint with state law enforcement, she was informed that Fierros had confessed to sexually assaulting her.

In March 2015, Rivera filed this suit against Fierros and Appellees under 42 U.S.C. § 1983. In addition to claims against Fierros, Rivera brought Fourteenth Amendment claims against Appellees, asserting that they were deliberately indifferent to the risks associated with hiring Fierros and that they inadequately trained and supervised jail employees. Appellees moved for summary judgment on the basis of qualified immunity. The district court granted the motion for summary judgment and dismissed Rivera's claims against Appellees. This appeal followed.

## II. DISCUSSION

"We review a summary judgment *de novo,* 'using the same standard as that employed by the district court under Rule 56.'" *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (quoting *Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 435 (5th Cir. 2000)). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Under the doctrine of qualified immunity, public officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has "mandated a two-step sequence for resolving government officials' qualified immunity claims." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A court must decide (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* Importantly, the Supreme Court held in *Pearson* that courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. At the same time, the Supreme Court recognized that deciding the two prongs in order "is often beneficial." *Id.*

When an official pleads qualified immunity, "the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). However, "[b]ecause this case arises in a summary judgment posture, we view the facts in the light most favorable to [Rivera], the nonmoving party." *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1769 (2015). That is, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

A.    **Deliberate Indifference in Hiring**

"In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates." *Wernecke v. Garcia*,

591 F.3d 386, 401 (5th Cir. 2009) (alterations in original) (internal quotation marks omitted) (quoting *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 254 (5th Cir. 2005)). "'[D]eliberate indifference' to the 'known or obvious consequences' of a hiring decision can amount to a constitutional violation on the part of the decision maker." *Gros v. City of Grand Prairie*, 209 F.3d 431, 433 (5th Cir. 2000) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)). Rivera contends that Appellees were deliberately indifferent to obvious safety risks when they hired Fierros despite his criminal record. In support of this contention, Rivera's expert opined that "[i]t should have been predictable that . . . hiring a person with a known history of arrests for sexually based offenses, without doing more to establish that the allegations were unfounded or untrue, would expose detainees to a significant risk of sexual assault."

When a plaintiff alleges that a supervisor inadequately considered an applicant's background, "'deliberate indifference' exists where adequate scrutiny . . . would lead a reasonable supervisor to conclude that the plainly obvious consequences of the decision to hire would be the deprivation of a third party's constitutional rights." *Id.* at 433–34; *accord Brown*, 520 U.S. at 411. The Supreme Court has noted that "predicting the consequence of a single hiring decision, even one based on an inadequate assessment of a record, is far more difficult than predicting what might flow from the failure to train a single law enforcement officer as to a specific skill necessary to the discharge of his duties." *Brown*, 520 U.S. at 410. Accordingly, a plaintiff must show that there was "a strong connection between the background of the particular applicant and the specific violation alleged" such that "the hired officer was highly likely to inflict the particular type of injury suffered." *Gros*, 209 F.3d at 434. "A showing of simple or even heightened negligence will not suffice." *Brown*, 520 U.S. at 407.

No. 16-10675

In *Brown*, the Supreme Court held that a county sheriff was not deliberately indifferent in hiring a police officer who had a criminal record. *Id.* at 415–16. After the officer used excessive force during an arrest, the arrestee brought a § 1983 claim alleging that the sheriff had failed to conduct an adequate review of the officer's background when hiring him. *Id.* at 399–401. The officer had previously pleaded guilty to several misdemeanors—assault and battery, resisting arrest, and public drunkenness—arising from a fight during college. *Id.* at 413. The sheriff's testimony at trial indicated that, despite obtaining a background report during the hiring process, the sheriff "did not inquire into the underlying conduct or the disposition of any of the misdemeanor charges." *Id.* at 401, 411. Although the Supreme Court noted that a jury could find the sheriff's "assessment of [the officer's] background was inadequate," the Court ultimately concluded that the officer's use of excessive force was not "a plainly obvious consequence of the hiring decision." *Id.* at 412, 415. The link between the officer's prior convictions and his use of excessive force was too tenuous to show that the sheriff had disregarded a known or obvious risk of injury. *Id.* at 412–14.

This Court has reached similar conclusions in cases involving allegations of sexual assault. *See Hardeman v. Kerr County*, 244 F. App'x 593, 596 (5th Cir. 2007) (per curiam); *Gros*, 209 F.3d at 436. In *Gros*, this Court held that there was not a "strong causal connection" between an officer's background and the plaintiffs' allegations that the officer sexually, physically, and verbally abused them during routine traffic stops. 209 F.3d at 436. Arguing that the police chief was deliberately indifferent in hiring the officer, the plaintiffs pointed to "scattered statements" in the officer's "pre-employment file that suggest[ed] he was sometimes too aggressive" during his previous employment with a campus police department. *Id.* at 435. However, the officer "had never sexually assaulted, sexually harassed, falsely arrested, improperly searched or

No. 16-10675

seized, or used excessive force against any third party." *Id.* In addition, the former colleagues who had characterized the officer as overly aggressive "also had positive things to say about [him] and ultimately recommended him as a good hire." *Id.* at 435–36. In the end, this Court concluded that the comments in the personnel file were, "at worst, mixed" and thus that the evidence was insufficient to show deliberate indifference in hiring. *Id.* at 436.

Similarly, in *Hardeman*, an inmate alleged that a jailer "forced her to perform oral sex on him, and took her into the shower area where he forcibly raped her." 244 F. App'x at 595. When the county hired the jailer several months earlier, a record from the Texas Employment Commission indicated that he had previously been fired by a school district for making "improper advances towards high school (female) students." *Id.* at 594–95. Though the county conducted a background investigation, there was no evidence that the county found out that the jailer had been fired or even contacted the school district regarding the jailer's previous employment. *Id.* at 594, 596. Yet this Court noted that "[e]ven if the County had done a thorough job of investigating" the jailer's background, it would have required "an enormous leap to connect 'improper advances' towards female students to the sexual assault." *Id.* at 596. Consequently, there were "no grounds to find that the alleged rape in question was a 'plainly obvious consequence' of hiring him." *Id.*

It does not require an enormous leap to connect an applicant's prior arrests for sex crimes with at least some risk—though perhaps not a plainly obvious one—that the applicant might sexually assault detainees at a jail. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). Indeed, detainees in jails and prisons are "restricted in their ability to fend for themselves" and are

7

therefore far more vulnerable than the general population. *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996). As illustrated by the instant case, officers in detention facilities are often able to exercise almost complete control over detainees, which creates real risks that officers will sexually assault the people in their care. These risks have received substantial and deserved attention and should, by now, be well-known to corrections officials. Accordingly, when hiring officers for detention facilities, officials must be careful to thoroughly examine applicants' backgrounds and diligently inquire about the conduct underlying any prior offenses. The Department of Justice's "Standards to Prevent, Detect, and Respond to Prison Rape," promulgated pursuant to the Prison Rape Elimination Act ("PREA"), describe detailed best practices for vetting applicants' backgrounds before they are hired by detention facilities. *See* 28 C.F.R. § 115.17 (2012).

Nevertheless, under the specific circumstances of this case, the connection between Fierros's prior arrests and the injury to Rivera is not strong enough to show that Appellees were deliberately indifferent in hiring him. Much like the officer in *Brown*, Fierros's prior arrests for indecency with a child by sexual contact "may well have made him an extremely poor candidate" for a position as jailer. *See* 520 U.S. at 414. But Fierros's juvenile record provided no detail regarding the alleged offenses, and there was no evidence that Fierros was ever charged or convicted. At the time of Fierros's arrests, the Texas crime of indecency with a child broadly prohibited all "sexual contact" with "a child younger than 17 years." Tex. Penal Code § 21.11(a) (2001).[1] Fierros was fifteen years old at that point, and it is entirely possible

---

[1] It was an "affirmative defense to prosecution" that the defendant (1) "was not more than three years older than the victim and of the opposite sex;" (2) "did not use duress, force, or a threat against the victim at the time of the offense;" and (3) "was not required . . . to register for life as a sex offender" and did not have "a reportable conviction or adjudication" for a Texas sexual offense. Tex. Penal Code § 21.11(b).

that he was arrested simply for engaging in uncoerced sexual activity with another minor who was under the age of consent—acts that would not necessarily evince an obvious risk that Fierros would engage in future sexual violence. Moreover, Bonner testified that he made some attempt, albeit a limited one, to investigate Fierros's prior arrests and was unable to gather any additional information regarding the incidents. Rivera has not supplied evidence to contradict these assertions.

Because the information available to Appellees was vague and inconclusive, a jury could not find that a plainly obvious consequence of hiring Fierros was that he would sexually assault a detainee. We hold that Rivera has failed to allege facts sufficient to show that Appellees were deliberately indifferent to known or obvious risks associated with hiring Fierros. Therefore, the district court did not err in holding that Appellees were entitled to qualified immunity on this claim.

## B.   Inadequate Training and Supervision

Rivera also argues that Appellees inadequately trained and supervised jail employees, which constituted deliberate indifference and resulted in the sexual assault. "For an official to act with deliberate indifference, the [supervisor] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998)). The Supreme Court has explained that supervisors' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger . . . liability." *Brown*, 520 U.S. at 407.

No. 16-10675

According to Rivera, even though a prior incident of sexual abuse occurred in July 2014, Appellees took little action to train and educate jailers regarding sexual misconduct and failed to implement "proper protocols to guard against sexual exploitation." Rivera also contends that Appellees "continued to allow female detainees to be taken by male jailers into the multipurpose room, which they knew was a blind zone, unmonitored by jail surveillance cameras, and did nothing to restrict access to this room, or to install security cameras to deter sexual abuse there."

Appellees respond that all jailers, including Fierros, were required to be licensed by the state and that the state licensing process included training on sexual contact and proper interaction with inmates. Appellees also contend that they provided training to jail employees that addressed sexual misconduct, a sign was posted reminding jailers that "sex with inmates" was prohibited, and Fierros signed a document when he was hired stating that he understood there was to be no sexual contact with detainees. In addition, Appellees point out that the multipurpose room was used by attorneys, chaplains, and mental health workers for private consultations with detainees. Appellees claim that they decided not to install cameras in that room out of "concern for privacy." Finally, Appellees highlight that the first incident of sexual misconduct occurred in an area of the jail monitored by cameras and was in fact discovered when another officer reported the conduct after observing the incident on the video surveillance system. As a result, Appellees argue that this prior incident would not have served as notice that the jail's existing system of video monitoring amounted to inadequate supervision.

Other circuits have held that officials can be found deliberately indifferent if they fail to modify training and policies after sexual assault occurs in their facilities. *Cash v. County of Erie*, 654 F.3d 324, 336–39 (2d Cir. 2011); *Tafoya v. Salazar*, 516 F.3d 912, 914–20 (10th Cir. 2008). In *Cash*, a

pretrial detainee was sexually assaulted by a sheriff's deputy at a detention facility. 654 F.3d at 327. A few years earlier, a deputy at the same facility had engaged in sexual acts with another pretrial detainee. *Id.* at 329. In response to the prior incident, the facility's superintendent merely "issued a one-page memorandum entitled 'Sexual Conduct,' reminding facility personnel of [the facility's] 'no-contact' policy." *Id.* at 330. The Second Circuit noted that "a reasonable jury could have concluded that the [prior sexual assault] complaint would have alerted [the sheriff] to the fact that mere proscriptions on sexual contact between guards and prisoners had proved an insufficient deterrent to sexual exploitation." *Id.* at 336. Therefore, the court held that the jury could find that the county and its sheriff were deliberately indifferent to their "affirmative duty to protect prisoners from sexual exploitation." *Id.* at 339.

Likewise, a few months before Rivera was sexually assaulted, another senior jailer sexually abused a female detainee at the Hale County Jail. This event should have alerted Appellees that a substantial risk of serious harm existed in their facility and that they needed to do more to protect detainees from sexual exploitation. Yet the record suggests that Appellees did not make any modifications to their training, policies, or supervision. Instead, Appellees merely reminded jailers that they should not sexually exploit detainees and posted a sign indicating that "sex with inmates" was prohibited. A jury could conclude that these reminders did not constitute an adequate response to the serious incident of sexual abuse that had recently transpired in the jail. *See id.* at 330, 336.[2]

---

[2] Rivera's expert argued that Appellees would have been wise to implement additional training and policies consistent with the PREA in response to the July 2014 incident. We agree that the PREA may have been a helpful guide to Appellees in revising their training and procedures, but we note that Appellees were not constitutionally obligated to conform their training and policies to the PREA. We agree with the Second Circuit in *Cash* that

No. 16-10675

Nonetheless, we must determine whether the constitutional right at issue was clearly established at the time of Appellees' alleged misconduct. In doing so, we look to "cases of controlling authority in [this] jurisdiction at the time of the incident which clearly established the rule" or "a consensus of cases of persuasive authority such that a reasonable [official] could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

It has long been clearly established that detainees like Rivera have the right to be protected from sexual abuse, both at the hands of correctional officers and fellow inmates, and that jail officials violate inmates' constitutional rights "by showing 'deliberate indifference' to a substantial risk" of sexual abuse "when the official[s] 'know[] of and disregard[] an excessive risk" of that harm occurring. *Doe v. Robertson*, 751 F.3d 383, 388 (5th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). By now, the substantial risk of sexual assault in jails and prisons is well-documented and obvious. *See, e.g.*, 42 U.S.C. § 15601 (congressional finding in the PREA that "experts have conservatively estimated that at least 13 percent of the inmates in the United States have been sexually assaulted in prison"). Jail administrators are not permitted to "bury their heads in the sand" and ignore these obvious risks to the inmate populations they have an affirmative duty to protect. *Walton v. Dawson*, 752 F.3d 1109, 1119 (8th Cir. 2014).

Accordingly, this Court has previously held that jail officials who provide "*no* training" on sexual abuse and leave their employees "virtually unsupervised" are deliberately indifferent to the substantial risk that jailers might abuse detainees. *See Drake v. City of Haltom City*, 106 F. App'x 897, 900 (5th Cir. 2004) (per curiam). Still, in the case at bar, Rivera concedes that

---

Appellees had discretion to determine what specific reforms were appropriate so long as they took significant action to better safeguard the safety of detainees.

officers at the jail received at least some state-sanctioned training aimed at sexual assault prevention. She also agrees that Appellees took some limited responsive action following the prior incident of sexual abuse. In other words, we are not faced with a case in which jail officials took *no* preventive measures to address the risk of sexual assault. And unfortunately, when Rivera was sexually assaulted, our case law did not provide much clarity on the scope of jail officials' obligations with respect to protecting detainees from sexual abuse. Indeed, Rivera has not identified any controlling Fifth Circuit authority establishing the constitutional inadequacy of Appellees' response to the risk of sexual assault in their jail.

On the contrary, one Fifth Circuit case may have led reasonable officials in Appellees' position to believe that their minimal response did not run afoul of the Constitution. *See Robertson*, 751 F.3d at 391–93. In *Robertson*, we held that federal officials did not violate clearly established law in failing to prevent a subcontractor's employee from sexually assaulting detainees while transporting them out of an immigrant detention center. *Id.* Although one of the subcontractor's employees had previously sexually assaulted a detainee in her cell, we noted that the previous incident "did not stem from any persistent risk related to detainee transport" and thus did not warn the federal officials that they needed to make changes to their transportation practices. *Id.* at 391–92. *Robertson* is distinguishable from the instant case. Here, the July 2014 sexual abuse occurred in the same facility where Fierros later sexually assaulted Rivera, and a jury could certainly find that this prior incident placed Appellees on notice that they needed to do more to protect detainees in the jail.[3] Nevertheless, in light of *Robertson*'s holding that federal officials did not

---

[3] *Robertson* also distinguished *Cash*, explaining: "*Cash* held that despite a rule (and laws) prohibiting any sexual contact between inmates and jail staff, a jury could have

need to adjust their transportation policies after a previous sexual assault occurred in their facility, reasonable officials in Appellees' position could have concluded that their limited response to the prior incident of sexual abuse did not violate the Constitution.

Furthermore, at the time of the sexual assault in this case, there was not a consensus of persuasive authority such that reasonable officials in Appellees' position would have known their actions were unlawful. *Cash* appears to be the only case that is closely analogous to the present one. *See* 654 F.3d at 330, 336. Especially in light of *Robertson*, a single case from one of our fellow circuits did not provide sufficient notice to Appellees that their actions were inadequate. In addition, *Tafoya* bears some similarities to the case at hand, but the facts in that case were far more extreme and egregious than those we consider today. *See* 516 F.3d at 914–20. There, the Tenth Circuit held that a county sheriff could be liable for a detention officer's sexual assault of an inmate because two other inmates had previously been sexually assaulted at the same jail and, in response to those prior incidents, the sheriff "made only minimal efforts to address the [facility's] glaring safety problems." *Id.* at 918–21. In contrast to the present case, however, *Tafoya* involved a jail with an "undisciplined culture of 'anything-goes'" and "pervasive delinquency" by staff. *Id.* at 919. Officers at the jail frequently violated the facility's "no-contact" policy, watched pornographic movies in the control room during their shifts, and commented on which inmates they would like to have sex with. *Id.* Reasonable officials in Appellees' position might well have concluded that the facts of *Tafoya* were distinguishable from the situation at the Hale County Jail.

---

concluded that, based on evidence of a prior rule violation, the county was deliberately indifferent in failing to do more to prevent assaults." 751 F.3d at 391 n.10.

No. 16-10675

As a result, we conclude that it was not clearly established at the time of the alleged misconduct that Appellees needed to make significant changes to their training, supervision, and policies in response to the July 2014 incident of sexual abuse. We hold that the district court did not err in concluding that the defendants were entitled to qualified immunity with respect to Rivera's inadequate training and supervision claims.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment and its dismissal of Rivera's claims against Appellees.