# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
October 6, 2023

Lyle W. Cayce
Clerk

_____

No. 21-20450

_____

James Richards,

*Plaintiff—Appellant*,

*versus*

Marsha McLane; Harris County, Texas; Judge Natalie C. Fleming,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CV-4109

_____

Before Jones, Dennis, and Willett, *Circuit Judges*.

Per Curiam:[*]

James Richards was adjudicated a sexually violent predator and civilly committed to outpatient treatment. When the Texas Legislature later amended its civil commitment law to create a tiered program that allowed for transfer of civil committees from an outpatient setting to total confinement, Richards consented to join the new program. He continued to live in the

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 21-20450

community as an outpatient for some time but eventually was arrested and charged with indecent exposure. The county judge released him to a state agency that transferred him to a civil commitment center. Richards brought due process claims under § 1983 against the county and the executive director of the state agency. The district court denied his claims at the summary judgment stage. We AFFIRM.

I

Richards was adjudicated a sexually violent predator by a Montgomery County jury in 2003. Under Texas's Sexually Violent Predator Act (SVPA),[1] the court civilly committed him for outpatient treatment and supervision "until [his] behavioral abnormality has changed to the extent that [he] is no longer likely to engage in a predatory act of sexual violence." After his commitment, Richards resided for ten years at the Southeast Texas Transitional Center, a residential facility. In 2015, Richards transitioned to his private residence in Harris County and continued to receive treatment as an outpatient.

Also in 2015, the Texas Legislature passed Senate Bill 746, which amended the SVPA.[2] Whereas the prior version of the Act provided exclusively for outpatient treatment, S.B. 746 instructed the newly created Texas Civil Commitment Office (TCCO) to develop a tiered program "provid[ing] for the seamless transition of a committed person from a total

---

[1] Before the amendments in 2015, the Sexually Violent Predator Act required civilly committed persons to "reside in a particular location" and undergo "outpatient treatment and supervision" coordinated by the Texas Office of Violent Sex Offender Management. Sexually Violent Predator Act, 76th Leg., R.S., ch. 1188, § 4.01, 1999 Tex. Sess. Law Serv. (West) (amended 2003) (version previously at TEX. HEALTH & SAFETY CODE §§ 841.081, 841.082).

[2] Act of May 21, 2015, 84th Leg., R.S., ch. 845, 2015 Tex. Sess. Law Serv. (West) (codified at TEX. HEALTH & SAFETY CODE § 841.001, *et seq.*).

No. 21-20450

confinement facility to less restrictive housing and supervision and eventually to release from civil commitment, based on the person's behavior and progress in treatment."[3] The Act provided that adjudicated sexually violent predators must "reside where instructed by the [TCCO]."[4] And it gave the TCCO authority to place committed persons in more or less restrictive settings based on the need to protect the community and the person's needs for treatment and supervision.[5]

S.B. 746 also directed courts with jurisdiction over committed sexually violent predators, after providing notice and a hearing, to amend civil commitment orders to conform with the legislative changes.[6] As a result, the Montgomery County court with jurisdiction over Richards's case sent him a description of the changes to the program and notified him of his right to a hearing before transfer into the tiered program. Richards waived his right to a hearing and consented to join the new civil commitment program. The court entered an order placing Richards in the tiered program, along with an amended order of civil commitment, which included a provision that Richards "shall reside where instructed by the TCCO."

After entry of these orders, Richards continued to live and work in the community as an outpatient. But in 2018, he was charged with a misdemeanor offense for indecent exposure after a complainant alleged that he exposed himself and masturbated on a public train. Richards was arrested and confined in the Harris County Jail. That same day, the TCCO issued an

---

[3] Tex. Health & Safety Code § 841.0831(b).

[4] *Id*. § 841.082(a)(1).

[5] Act of May 21, 2015, 84th Leg., R.S., ch. 845, 2015 Tex. Sess. Law Serv. (West) (amended 2023) (current version at Tex. Health & Safety Code § 841.0834).

[6] Act of May 18, 2015, 84th Leg., R.S., ch. 845, § 40(b), 2015 Tex. Sess. Law Serv. Ch. 845 (West).

No. 21-20450

emergency detention order requiring Richards to be returned to a more restrictive setting and directing the Harris County Sheriff to release Richards only to an official authorized by the TCCO.

Richards attended his 24-hour bail/bond hearing, where bail was initially set at $5,000. But a few days later, Harris County Judge Natalie Fleming set Richards's bail/bond to $0 and ordered him to be released to the TCCO under the emergency detention order. Harris County released Richards to the TCCO, which transferred him to the Texas Civil Commitment Center (TCCC), an inpatient civil confinement center in Littlefield, Texas. Upon arrival, Richards was placed in the TCCC special management unit due to his pending criminal charge.

On the afternoon of his transfer, Richards received a violation notice of his right to request a hearing with his committing court to contest the transfer. The violation notice also gave details of Richards's violation. It indicated that Richards lied to his TCCO case manager about the train incident, allegedly telling his case manager that he was detained and questioned by the Houston Metro Police about a problem with his Metro fare but leaving out that he had been questioned about a sexual offense. The notice also indicated that Richards "[had] recently been impatient and [had] been pushing the boundaries of treatment."

Richards chose not to request a hearing to contest his transfer to TCCC. And for the next two years, while he remained at TCCC and while this lawsuit was pending, he signed off that he was placed in the appropriate treatment tier during annual reviews of his tier level.

In 2018, Richards filed this pro se lawsuit in federal court against numerous defendants, including Harris County and Executive Director of the TCCO Marsha McLane. He brought several state and federal claims. Relevant here, he brought substantive and procedural due process claims

4

No. 21-20450

under 42 U.S.C. § 1983. He sought declaratory relief, injunctive relief, and damages.

Harris County moved for summary judgment, and Richards filed a cross-motion for summary judgment. The court granted summary judgment to Harris County and denied Richards's cross-motion. Executive Director McLane also moved for summary judgment, which the court granted. The court dismissed the claims against various other defendants as well.[7] Richards timely appealed.

## II

"We review rulings on motions for summary judgment de novo, applying the same standards prescribed for use by the district court." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538 (5th Cir. 2004) (italics omitted). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Where, as here, parties have filed cross-motions for summary judgment, each motion must be considered separately because each movant bears the burden of showing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law." *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel, L.L.C.*, 620 F.3d 558, 562 (5th Cir. 2010). Pro se briefs are liberally construed. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam).

---

[7] Richards also sued Judge Fleming for injunctive relief and damages. The district court dismissed the claims with prejudice because Judge Fleming was no longer serving as a judge, so she could not grant Richards injunctive relief, and the doctrine of judicial immunity protected her from liability for Richards's claims for damages.

No. 21-20450

### III

On appeal, Richards challenges the district court's grants of summary judgment to Harris County and McLane on his § 1983 due process claims. We address each in turn.

### A

We start with Harris County. The district court granted summary judgment to Harris County and denied Richards's cross-motion for summary judgment on the ground that Richards failed to establish municipal liability. On appeal, Richards argues: (1) the district court failed to adequately consider his cross-motion; and (2) the district court substantively erred in granting summary judgment to Harris County.

### 1

Richards first argues that the district court erred by failing to consider his cross-motion for summary judgment against Harris County separately from Harris County's motion for summary judgment. In fact, Richards argues, "[I]t appears that [the court] didn't consider [his cross-motion] at all."

We disagree. The district court indicated that its opinion granting summary judgment to Harris County was based on both motions. It acknowledged that "Richards filed a cross-motion for summary judgment" and explicitly denied that cross-motion. The court also addressed many of Richards's summary judgment arguments throughout its opinion. The mere fact that the court considered and decided both motions in the same opinion does not mean they were not considered separately. *See Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 297 (5th Cir. 2012) ("Although the

No. 21-20450

district court announced its decision on each party's respective motion in a single paragraph, the motions were considered separately.").[8]

Richards's confusion may stem from the fact that the district court did not explicitly address *all* of his summary judgment arguments. For instance, the court declined to address Richards's arguments on the merits of his substantive due process claim. But the court was not required to address these arguments because it had already held that there was no Harris County policy, practice, or custom that infringed Richards's constitutional rights.[9] Without a policy, practice, or custom, Harris County cannot be liable for substantive due process violations under § 1983. *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 694–95 (1978). Thus, the court was not required to further address Richards's arguments when those arguments could not create a dispute of material fact. Accordingly, the district court fulfilled its duty to consider the cross-motions separately.

2

Richards next argues that the district court substantively erred by granting summary judgment to Harris County. We disagree. Summary judgment was proper because Richards failed to identify a policymaker or an official policy to establish municipal liability.

A municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue. *Monell,* 436

---

[8] *Greer* is "not controlling precedent," but we cite it as "persuasive authority." *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006) (citing 5TH CIR. R. 47.5.4).

[9] Richards argues that the district court failed to address his argument that Judge Fleming was a final policymaker whose single decision qualified as an official policy. However, the district court reasoned that Judge Fleming's decision to cancel bail was not a county policy but a reaction to an order from a state agency. This was sufficient to address and resolve Richards's argument.

U.S. at 694–95. "To establish municipal liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009). "[A] single decision may create municipal liability if that decision were made by a final policymaker responsible for that activity." *Woodard v. Andrus*, 419 F.3d 348, 352 (5th Cir. 2005) (quoting *Brown v. Bryan Cnty.*, 67 F.3d 1174, 1183 (5th Cir. 1995)). A county judge can be a policymaker when acting "pursuant to his or her administrative role" but not when "acting in his or her judicial capacity to enforce state law." *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992). A judge acts in a judicial capacity when her actions are "the effectuation of the policy of the [state] . . . for which the citizens of a particular county should not bear singular responsibility." *Carbalan v. Vaughn*, 760 F.2d 662, 665 (5th Cir. 1985) (quoting *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980)). "A judge's setting an arrestee's bail . . . is part of the state adversary proceedings and a judicial function." *Daves v. Dallas Cnty.*, 22 F.4th 522, 539–40 (5th Cir. 2022) (en banc), *followed by Daves v. Dallas Cnty.*, 64 F.4th 616 (5th Cir. 2023) (en banc) (remanding with instructions to dismiss).

Richards's due process claims focus on Judge Fleming's elimination of bail. He argued below that Judge Fleming was a final policymaker whose single decision to cancel bail qualified as an official municipal policy that violated his substantive and procedural due process rights. The district court held that Richards failed to establish a Harris County policy, practice, or custom to establish municipal liability under *Monell*, explaining that "the decision by the Criminal Court judge to eliminate Richards's bond was not the result of any Harris County policy, practice, or custom, but was a direct response to the TCCO's Emergency Detention Order."

No. 21-20450

We agree with the district court. Richards has not shown that Judge Fleming was acting as a county policymaker or that cancellation of bail was a municipal policy. He does not contend that Judge Fleming was promulgating countywide rules or acting in an administrative role when she canceled his bail. On the contrary, Judge Fleming's cancellation of bail was part of state adversary proceedings and constituted a judicial function. *Daves*, 22 F.4th at 539. And as the district court pointed out, when Judge Fleming canceled bail and released Richards to the TCCO, she was acting under an emergency detention order from a *state* agency rather than effectuating a *county* policy. Richards has failed to create a factual dispute on the policymaker and policy issues.

We hold that the district court properly granted summary judgment to Harris County.

B

We turn to Richards's argument that the district court erred when it granted summary judgment to Executive Director of the TCCO Marsha McLane on his due process claims. We start with the preliminary issue of qualified immunity and then consider Richards's substantive and procedural due process claims.

1

First, qualified immunity. Richards seeks injunctive relief from McLane in her official capacity and damages in her personal capacity. "[A] state official in his or her official capacity, when sued for injunctive relief, [is] a person under [42 U.S.C.] § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (internal quotation marks omitted). Likewise, plaintiffs can sue state officials in their personal capacities for damages under § 1983. But those officials are shielded by

No. 21-20450

qualified immunity in certain instances. *Reichle v. Howards*, 566 U.S. 658, 664–70 (2012).

McLane asserts a qualified immunity defense in response to Richards's personal-capacity suit. To assess a qualified immunity defense, a court must decide: "(1) whether the facts that a plaintiff has alleged make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Rivera v. Bonner*, 952 F.3d 560, 564 (5th Cir. 2017) (alteration omitted) (internal quotation marks omitted). However, Richards's claims fail because the facts alleged do not make out a constitutional violation. Thus, our qualified immunity analysis ends here.

2

Next, substantive due process. Richards argues that McLane violated his substantive due process rights by: (1) retroactively applying S.B. 746 to him; (2) placing him in isolation; and (3) acting under a court order that was void for lack of jurisdiction. He emphasizes that his due process arguments are as-applied arguments rather than arguments about the facial constitutionality of S.B. 746. Each of Richards's arguments fails upon inspection.

"[T]he Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).

The district court denied Richards's substantive due process argument on the ground that "a person who was civilly committed under the

earlier statute [that is, the pre-2015 version of SVPA that required outpatient treatment] does not have a vested liberty interest in outpatient treatment." We reached a similar conclusion on similar facts in our unpublished decision in *Martinez v. McLane*. 792 F. App'x 282, 286 (5th Cir. 2019) (per curiam). In *Martinez*, we held that a civil committee had no liberty interest in outpatient treatment because (1) he had violated the conditions of his order of commitment, and (2) he had consented to enter the tiered program created by S.B. 746. *Id.* at 286.

Richards thus has no vested liberty interest in outpatient treatment. But Richards *does* have a liberty interest in remaining in the community. *See Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (holding that a parolee has a liberty interest in not having conditional freedom revoked); *In re State*, 556 S.W.3d 821, 830 (Tex. 2018) (holding that civilly committed persons have "a liberty interest in being free from inpatient treatment"). This liberty interest exists even though Richards's freedom was contingent on certain conditions imposed by his order of commitment. *See Morrissey*, 408 U.S. at 482 (holding that a parolee possesses a liberty interest even "[t]hough the State properly subjects him to many restrictions not applicable to other citizens").

Concluding that Richards possesses a liberty interest, we turn to his specific arguments, beginning with retroactivity. To determine whether a statute is applied retroactively, we ask "whether the new provision attaches new legal consequences to events completed before its enactment." *Lopez Ventura v. Sessions*, 907 F.3d 306, 314 (5th Cir. 2018) (citation omitted). Retroactive application of laws can violate substantive due process because "[t]he Due Process Clause . . . protects the interests in fair notice and repose that may be compromised by retroactive legislation." *Landgraf v. USI Film Products*, 511 U.S. 244, 266 (1994). Thus, a justification sufficient for a statute's prospective application under the Clause "may not suffice" for its retroactive application. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 17

(1976). "[T]hat burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984).

Richards argues that McLane applied the 2015 amendments to him retroactively when she put him in the tiered program. Even spotting Richards the proposition that the statute was applied retroactively to him, his argument fails. The retroactive application of S.B. 746 to Richards does not implicate the interests in "fair notice and repose" that due process protects. *See Landgraf*, 511 U.S. at 266. Before transfer into the tiered program, the TCCO gave notice and an opportunity for a hearing, but Richards waived his rights and consented to enter the program. By the time Richards transferred to inpatient treatment, his expectation would have been that he was to "reside where instructed by TCCO," as stated in his amended court order. Richards does not identify any authority holding that this circumstance or one like it, where an individual has *consented* to be subject to a new law, constitutes a retroactive application of a law in violation of substantive due process. Furthermore, the Texas Legislature and the TCCO had a rational basis for applying the law retroactively. The State's interest in uniformity in the civil commitment program and keeping the community safe by transferring committees to higher levels of care as necessary justified retroactive application.

Richards next argues that his placement in the TCCC secure management unit, which he contends was like solitary confinement, was impermissible punishment of a pretrial detainee and civil committee, in violation of substantive due process. The purpose of civil commitment "is to treat the individual's mental illness and protect him and society from his potential dangerousness." *Jones v. United States*, 463 U.S. 354, 368 (1983). Civilly committed persons are "entitled to more considerate treatment and

conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982). Additionally, "due process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed." *Seling v. Young*, 531 U.S. 250, 265 (2001).

Richards's placement in the secure management unit was consistent with TCCO standard operating practice for civil committees with outside pending charges. This policy is not punishment and bears a reasonable relationship to the purpose for which Richards was committed. In her brief, McLane explains that "temporary placement in [the secure management unit] is for the safety and security of the clients and furthers the purpose of the facility by protecting all clients and limiting disruption of treatment." This explanation is reasonable and not clearly "a sham or mere pretext" adopted to conceal "the forbidden purpose to punish." *Kansas v. Hendricks*, 521 U.S. 346, 371 (1997) (Kennedy, J., concurring).

Finally, Richards argues that McLane violated his substantive due process rights because the court order placing him in the new treatment program and the amended order of commitment are void for lack of jurisdiction. Richards was originally committed in the 221st District Court of Montgomery County, and his case was later transferred to the 435th District Court. Richards argues that the 435th District Court did not have jurisdiction to enter the commitment order because it was not the original committing court. For support, he cites a provision in the SVPA, which says, "The committing court retains jurisdiction of the case."[10] However, nowhere does the Act say that the committing court cannot transfer a case to another court within the county of proper jurisdiction. Indeed, when the administrative

---

[10] Tex. Health & Safety Code § 841.082(d).

judge transferred Richards's case, the 435th District Court of Montgomery County *became* the committing court.[11]

We hold that the district court properly granted summary judgment to McLane on Richards's substantive due process claim.

3

Finally, Richards argues that McLane violated his procedural due process rights by confining him in an inpatient facility in 2018 without a predeprivation hearing. The district court granted summary judgment to McLane on this claim, holding that "[b]ecause Richards both waived his right to a hearing on the change to his tier assignment, and chose not to seek a hearing following the change in his tier assignment, he fails to identify a violation of his right to procedural due process." We agree with the district court.

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who would seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Procedural due process claims are subject to a two-step inquiry: "The first question asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Meza v. Livingston*, 607 F.3d 392, 399 (5th Cir. 2010) (internal quotation marks omitted). Procedural due process is "a flexible concept,"

---

[11] *See* TEX. GOV'T CODE § 74.093(d) ("When a case is transferred from one court to another as provided under this section, all processes, writs, bonds, recognizances, or other obligations issued from the transferring court are returnable to the court to which the case is transferred as if originally issued by that court.").

No. 21-20450

and the procedural protections due under the Fourteenth Amendment vary depending on the circumstances. *Zinermon*, 494 U.S. at 127.

To discern what process is due, courts apply the *Mathews v. Eldridge* balancing test, which weighs several factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[12]

In most cases, the *Mathews* test will weigh in favor of notice and an opportunity to be heard prior to the deprivation of a protected interest. *See Bowlby v. City of Aberdeen*, 681 F.3d 215, 220 (5th Cir. 2012). However, in some cases, such as "where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). "In particular, where the State acts to abate an emergent threat to public safety, postdeprivation process satisfies the Constitution's procedural due process requirement." *RBIII, L.P. v. City of San Antonio*, 713 F.3d 840, 844 (5th Cir. 2013). Additionally, "where the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures underlying the decision to act are sufficiently reliable to minimize the risk of erroneous determination, government may act without providing additional 'advance procedural safeguards.'" *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 19 (1978) (quoting *Ingraham v. Wright*, 430 U.S. 651, 680 (1977)).

---

[12] 424 U.S. 319, 335 (1976).

Having already concluded that Richards possesses a liberty interest in remaining in the community, we undertake the *Mathews* balancing test to determine whether the procedures provided were constitutionally sufficient.

We start with the private interest. Richards undoubtedly possesses an interest in remaining in the community. Although he was subject to "many restrictions not applicable to other citizens," *Morrissey*, 408 U.S. at 482, while living in his private residence as an outpatient, he enjoyed significant freedoms that were taken from him in inpatient confinement. He was able to work, move freely in the community, and see family and friends. However, Richards's interest is tempered in some important ways. First, the "length or severity of the deprivation." *Memphis Light*, 436 U.S. at 19. Although Richards's civil confinement has lasted years, Richards was given the opportunity to request a hearing on the day of his transfer to the TCCC. But he did not request one. Thus, Richards faced only a short period of confinement without the opportunity for a hearing, which lessens the severity of the deprivation. Second and critically, Richards *consented* to joining the tiered program. He was thus aware, from his amended court order, that he was to reside where instructed by the TCCO and that he could be moved to a more restrictive tier.

Next, the risk of erroneous deprivation and the value of additional procedures. Consider the robust procedures used by the State. At the outset, Richards was adjudicated to be a sexually violent predatory beyond a reasonable doubt by a jury of his peers.[13] When S.B. 746 was passed, Richards was given notice of the changes and the right to request a hearing with his committing court. He waived his right to a hearing and consented to the new

---

[13] Tex. Health & Safety Code § 841.062 ("The judge or jury shall determine whether, beyond a reasonable doubt, the person is a sexually violent predator.").

tiered civil commitment program. When Richards was arrested for public masturbation, his arrest was subject to the usual probable cause requirement and protections. On the afternoon of his transfer to the TCCC, he received a violation notice of his right to request a hearing with his committing court to contest the transfer. He chose not to request a hearing. Finally, during his confinement, Richards received annual reviews of his tier level during which he signed off that he was at the appropriate tier. While there is of course a risk of erroneous deprivation when a predeprivation hearing is not held, the process that Richards had already received before his transfer to TCCC lessened the risk sufficiently. And the prompt annual reports gave Richards postdeprivation process, further reducing the risk of long-term erroneous deprivation.

Finally, the State's interest. The TCCO had a very strong interest in acting quickly to protect the community and in providing treatment and supervision to Richards, as quick action is necessary when a civilly committed person has regressed in treatment or violated a civil commitment rule. Because Richards was offered bail, the TCCO had to act quickly to make sure he was not released into the community.

Richards points us to a lower court case, *Hitt v. McLane*, No. AU-17-CA-00289-SS, 2019 WL 13080577 (W.D. Tex. Apr. 26, 2019), in which a civil committee violated a condition of his outpatient treatment by failing to tell the TCCO about his relationship with his coworker. The district court concluded that he was entitled to the same due process given in the context of parole revocation, as outlined by the Supreme Court in *Morrissey v. Brewer*, 408 U.S. 471 (1972). *Id.* at *8. Accordingly, the district court held that the TCCO violated procedural due process by failing to provide a predeprivation hearing. *Id.* However, we cannot rely on *Morrissey* on the facts before us today. Important differences exist between Richards and a parolee. First, the State has a greater interest here than in *Morrissey* in acting quickly

to protect the community. Unlike Richards, the parolee in *Morrissey* was already incarcerated while he awaited a decision on revocation. *See* 408 U.S. at 472–73. Richards, in contrast, was about to be granted bail and potentially released when the TCCO issued its emergency detention order. Thus, the State here has an interest in acting quickly to *prevent* Richards's release to protect the community. Second, unlike a parolee, Richards consented to join a tiered program in which he was directed to reside where instructed by the TCCO. There was no analogous consent in *Morrissey*. Because of these factors, the *Mathews* calculus comes out differently in this case and does not require a predeprivation hearing.

In light of Richards's consent to enter the tiered program, the promptness of postdeprivation procedures, and the need for quick action to protect the public, we think the *Mathews* balancing test weighs in favor of the State.

Accordingly, the district court properly granted summary judgment to McLane on the procedural due process issue.

*　　*　　*

We AFFIRM.